# UNITED STATES DISTRICT COURT
# MIDDLE DISTRICT OF FLORIDA
# JACKSONVILLE DIVISION

United States of America,
    Plaintiff,

Jacksonville Brotherhood of Fire Fighters,
Jacksonville Branch of NAACP, et al.,
    Plaintiff Intervenors,        Case No. 3:12-cv-451-J-32MCR

v.

Consolidated City of Jacksonville,
Jacksonville Association of Fire Fighters,
JAFF, IAFF,
    Defendants.
_____/

Rufus Smith, et al.,
    Plaintiffs,        Case No. 3:11-cv-345-J-32MCR

v.

Consolidated City of Jacksonville,
Jacksonville Association of Fire Fighters,
JAFF, IAFF,
    Defendants.
_____/

Equal Employment Opportunity
Commission,
    Plaintiff,        Case No. 3:12-cv-491-J-32MCR

v.

Jacksonville Association of Fire Fighters,
JAFF, IAFF,
    Defendant.
_____/

## JACKSONVILLE ASSOCIATION OF FIRE FIGHTERS' MOTION TO ENFORCE CONSENT DECREE

It is certainly possible to design and administer a situational judgment test in compliance with the Consent Decree – a test that would produce reliable, stable, and valid results based on objective answers – yet, the situational judgment tests used by the City of Jacksonville ("the City") have produced wildly subjective, unstable, and arbitrary results where the tests are unreliable, invalid, in violation of the Consent Decree, and fail to comply with Title VII.

The Jacksonville Association of Fire Fighters ("JAFF") therefore moves this Court to enforce compliance with the Consent Decree (Doc. 393, attached as Appendix A). The City has deployed a "situational judgment test" that is so grossly infected with subjective opinion, contrary to the Consent Decree's objectivity requirement, that subsequent protest committees are changing between ten and twenty-five percent of the answers, significantly reshuffling promotional lists such that eight out of the top ten candidates are different firefighters. Such high instability in the answer keys demonstrates that these tests are not reliable, and therefore not valid, and thus not in compliance with the Consent Decree. Despite these fundamental flaws, the situational judgment tests now drive examination outcomes because the City weights the situational judgment examination as seventy-five percent of the total score.

Because the tests are not reliable and therefore not valid, the present situation in the Jacksonville Fire and Department ("JFRD") does not meet "Title VII disparate impact standards" as required by the Consent Decree. (Consent Decree ¶ 77). Title VII requires that promotional tests be job related; promotional tests "must have a manifest relationship to the employment in question." <u>Griggs v. Duke Power Co.</u>, 401 U.S. 424, 432 (1971); <u>Washington v. Davis</u>, 426 U.S. 229, 249 (1976). Job related test questions are "predictive of or significantly correlated with important elements of work behavior." <u>Albemarle Paper Co. v. Moody</u>, 422 U.S. 405, 431 (1975)(quoting 29 C.F.R. § 1607.4(c) (1981)). Title VII further requires that promotional tests be reliable; reliability is "the extent to which the exam would produce consistent results if applicants repeatedly took it or similar tests." <u>Nash v. Consol. City of Jacksonville, Duval Cnty., Fla.</u>, 895 F. Supp. 1536, 1548 (M.D. Fla. 1995). A test that is not job related or not reliable cannot be valid. <u>Nash</u>, 895 F. Supp. at 1545-48.

The City's new situational judgment tests:

- are not objective and therefore are not reliable or valid, thus failing to comply with Title VII;
- are unconnected to any external reading list, thus violating Article 13 of the Collective Bargaining Agreement, contrary to the Consent Decree;

- and purport to partially credit incorrect answers, in violation of the Consent Decree.

**The City's Situational Judgment Tests Are Demonstrably Unreliable**

Following entry of the Consent Decree, the City has administered seven promotional examinations in the JFRD.  The first promotional examination employed only the traditional testing method. This examination generated a handful of protests, which were resolved without significant changes to the answer key within six weeks, allowing for timely certification of a promotion list, as was the traditional procedure.

The next five promotional examinations administered after the Consent Decree all included a "situational judgment test" requiring examinees to read scenarios and then evaluate possible responses on a scale of 1 to 5, explained by the City's testing company as follows: (See Suppression Captain Promotional Exam Orientation Guide p. 14, attached as Appendix B).

| Rating | Response Effectiveness Scale Descriptor |
|---|---|
| 1 | **Ineffective**—This response option may result in <u>significant negative consequences</u>. |
| 2 | **Somewhat Ineffective**—This response option will result in <u>some negative consequences</u>, with very few positive outcomes. |
| 3 | **Moderately effective**—This response option may produce <u>some negative</u> consequences, but <u>overall results in an "acceptable" outcome</u>. |
| 4 | **Effective**—This response option will <u>result in a positive outcome</u>, <u>with little to no negative consequences.</u> |
| 5 | **Highly Effective**—This response option will result in an <u>optimal outcome</u>, <u>with no negative consequences.</u> |

4

The possible responses to each scenario were unrelated (they were not ranked against each other); each scenario might have presented varieties of all "ineffective" or all "highly effective" responses or a mix.

In what should be a surprise to no one, the subjective and imprecise language of these situational judgment tests generated hundreds of protests resulting in significant alterations in scores and rankings. In the case of the Suppression Captain examination, for example, the City received 994 protests resulting in changes to almost fifteen percent of the answers on the situational judgment test. (Affidavit of Dr. Carl Swander ¶¶ 8-12, attached as Appendix C). As a result, protest committees now typically require six months of effort before a promotional list can be certified. In practical terms, these protest committees are finding it necessary to rewrite the answer keys after the examinations.

Wholesale revisions to the answer keys following the examinations has proven necessary because competent people may disagree as to the definition of phrases such as "somewhat ineffective," "acceptable outcome," and "some negative consequences." Protests also questioned whether "consequences" and "outcomes" should be judged solely from the perspective of the JFRD leadership or whether "consequences" and "outcomes" should also consider factors such as citizen priorities or consequences to an individual firefighter.

The revisions of the answer keys were carried out by protest committees of five persons (two from the testing company, one from the City, and two firefighters), none of whom were subject matter experts involved in designing the examination. The individual members of each protest committee change for each examination. Prior to the Consent Decree, protest committees could reliably refer to the assigned reading material in evaluating the phrasing of questions. Now, when confronted with the problem of interpreting a precise meaning for the kind of subjective language used on the situational judgment test, the members of each protest committee instead rely on their own life experiences and individual common sense. Thus, the protest committee's changes to the answer keys are themselves subjective; variations in the makeup of the protest committee will therefore lead to different revisions to the same answer keys, and even the same protest committee members have, on occasion, revised their own revisions.

Without any reading material to ground the process, some protest committees have taken a populist approach to determining the correct answers to examination questions; if many people protest an answer, that answer will be changed, but if only one examinee protests an answer, that answer will not be changed even if the one examinee's protest has merit. This method for determining the "more right" answers to examination questions (and assigning partial credit for wrong answers) post-administration cannot meet the standards of Title VII.

Indeed, the US Supreme Court's recent decision in a parallel context in <u>Students for Fair Admissions, Inc. v. President & Fellows of Harvard College</u>, reaffirms that "[m]eritocratic systems, with objective grading scales" are necessary to pass constitutional muster, whereas "standardless," "imprecise," "opaque," "undefined," and "arbitrary" systems cannot meet constitutional standards. <u>Students for Fair Admissions, Inc. v. President & Fellows of Harvard Coll.</u>, 2023 WL 4239254 at * 25, *48 (U.S. June 29, 2023)(J. Roberts for the majority)(J. Thomas concurring).

Test questions untethered from any reading material indulge the conceit that "innate judgment" or "wisdom" may be measured, but Title VII has always required that "any tests used must measure the person for the job and not the person in the abstract.'" <u>United States v. Georgia Power Co.</u>, 474 F.2d 906, 912 (5th Cir. 1973)(quoting <u>Griggs</u>, 401 U.S. at 436). The City's current situational judgment tests measure neither; because the test questions are not job related and the test results are demonstrably unreliable, the City's current situational judgment tests are invalid and arbitrary.

### Promotional Tests Untethered from Reading Material Violate the Consent Decree as well as the Collective Bargaining Agreement

The Consent Decree requires that "New Promotion Examinations" be conducted "in accordance with the Collective Bargaining Agreement in existence at the entry of the Consent Decree" and contemplates that JAFF may object to

promotional tests "that would not comply with the Collective Bargaining Agreement." (¶¶ 100-02, 104). The Consent Decree specifies that "[n]othing in this Consent Decree is intended to contradict or alter, nor does it contradict or alter, the terms or conditions of the Collective Bargaining Agreement, Article 13 'Promotions,' …which are attached hereto as Appendix D and incorporated herein by reference." (¶ 122).

Article 13 of the Collective Bargaining Agreement requires that "Standard external reading lists for promotional examinations shall be established for all promotional classifications within the Jacksonville Fire and Rescue Department." (§ 13.9). Seven sentences in the Collective Bargaining Agreement require that such "reading lists" be "certified annually" and made "available" both online and in hard copy while limiting any amendments prior to examination dates. (§ 13.9). There has never been any question that this contract language means that a promotional test must be drawn from and based upon the study material specified. Indeed, the City refers to these reading lists as "source materials" from which questions and answers "will be drawn directly." (App. B at p. 11). Article 13 allows no exceptions to this time-tested tradition and practice.

The City's new situational judgment test violates the Consent Decree and Article 13 by intentionally separating the situational judgment test from the reading lists. The City now claims that situational judgment tests are based on "situations"

rather than "source materials like textbooks or policies" because "this is not a 'source-based' test"; correct answers arise not from identified reading lists but from "appropriate problem-solving skills." (App. B at p. 12). A situational judgment test decoupled from any source material does not comply with Article 13, cannot be job-related, and is not a valid test as required by the Consent Decree.

### Promotional Tests Giving Partial Credit for Wrong Answers Violate the Consent Decree

The Consent Decree mandates that promotional examinations "will require examination takers to select an answer" and that answer must be "objective" and "predetermined." (App A, Consent Decree ¶¶ 100-01). However, the City's new situational judgment tests give partial credit for incorrect answers and vary that partial credit depending on how wrong the incorrect answer is thought to be. (App. B, Promotional Exam Orientation Guide, Suppression Captain at pp. 12-15). The JAFF bargained for, and the Consent Decree requires, an objective test in which there is "an answer" for each question, not a test that credits all answers and purports to measure and partially credit incorrect answers.

### Moving the Goalposts Changes the Score

If the City administered the same or similar tests to the same or similar examinees tomorrow, the City would not get the same or similar results. Given the extent of the changes necessary to the answer keys and given that each unique protest committee rewrites each answer key in a unique way, the situational judgment

9

portion of these promotional examinations is not reliable. "Reliability is a fundamental and critical element to testing that must be present to demonstrate what we are trying to measure is what we are actually measuring." (App. C, Swander Aff., ¶ 5).

In practical terms, substantial revisions of the answer keys after exams have already been administered result in significant changes to the rank order of the promotional lists. For the Captain Suppression examination, for example, revisions to the answer key resulted in an average change in rank of fifteen positions on the promotional eligibility list, meaning that any firefighter could expect their rank order to rise or fall by approximately fifteen positions. Thus, only two of the top ten candidates on the promotional list remained the same after the revision of the answer key; eight of the top ten candidates were different firefighters.[1] "Score variations of this magnitude raise serious concerns regarding the exam's reliability and, thus, its ability to accurately assess job-related requirements." (Affidavit of Dr. Toni Locklear, ¶ 14, attached as Appendix E).

In fact, the City's testing company has now jettisoned its original situational judgment test in favor of a less elaborate format. The new format, however, which was employed on only the most recent promotional examination, still generated

---

[1] Last year, after the protest committee revised the original answer key and a promotional list for the Captain Suppression examination was certified, the City informed JAFF that the testing company had failed to forward some two hundred protests to the protest committee, forcing the City and JAFF to reach an agreement resulting in yet a third re-ranking of results.

substantial protests, resulting in changes to approximately twenty-five percent of all answers. Such wide swings in post-examination results demonstrate that the City's situational judgment tests are not reliable or objective and have "already had a significant impact on those people promoted and will likely continue to be problematic using the same methodology in future promotional processes." (App. C, Swander Aff., ¶ 23).

The Consent Decree requires reliable and valid promotional examinations which use only "objective (predetermined) answers" (App. A, Consent Decree, ¶100). Reliability and validity are the watchwords of the testing industry as demonstrated by the <u>Uniform Guidelines on Employee Selection Procedures</u> (1978), by the <u>Principles for the Validation and Use of Employee Selection Procedures</u> (2018) authored by the Society for Industrial and Organizational Psychology, and by the <u>Standards for Educational and Psychological Tests</u> (2014) published by the American Psychological Association. The City's new promotional tests fail these basic standards; "it is clear that subjectivity concerning each individual question in the situational judgment portion of the exam is causing too much error for the test to be reliable." (App. C, Swander Aff., ¶ 7).

### The City May Not Forestall Compliance with the Consent Decree

Now, even after the new promotional tests have resulted in promotions, the City insists that the JAFF has no right to review examination development

11

documents to ensure compliance with the Consent Decree, which explicitly contemplates the City sharing highly sensitive examination development materials and imposes upon "all attorneys and experts" an obligation to maintain their confidentiality, even from their own clients. (App. A., Consent Decree, ¶ 107). The Consent Decree further instructs the City to redact personally identifiable information when providing documents "to another Party." (Id. at ¶ 132).

Now that the tests, makeup tests, and protest process have all been completed, the language of the Consent Decree entitles the JAFF to review the examination development documents. "The City will provide the final planned job analysis to the Reviewing Party(ies) *and other Parties' counsel* in accordance with Paragraph 81." (¶¶ 86, 89, 92, 103-05)(emphasis supplied). The repeated phrase "[i]n accordance with Paragraph 81" indicates that "the City will provide all relevant examination-development documents," and paragraph 81 itself addresses only the development period of new tests, whereas later paragraphs addressing the entire examination process repeat that "other parties counsel" will receive the examination-development documents. (See, e.g. Consent Decree, ¶ 105). Any other reading of this language operates to exile the JAFF from any review of the new examination process at any time.

Prior to administration of the first new examination, this Court denied the JAFF's request to order the City to cooperate with the JAFF in providing certain

information this Court noted should subsequently be provided after administration of the examination. At that time, the City raised concerns about protecting the integrity of the examination prior to its use, and the City went on to assure this Court "that most of these documents will eventually become public records" available to the JAFF. (Doc. 422 fn. 4). Now, the examinations are in the past, and concerns about potential cheating are no longer present, but the City has refused to provide any test-development documents whatsoever, now claiming that "trade secrets" prevent their release. Moreover, JFRD leadership has ordered firefighters who served on protest committees not to speak to anyone about the committee's operation or practices. The City has rejected JAFF's request to arrange an "attorneys' and experts' eyes only" confidentiality agreement to review the material.

The first line of "reviewing parties" who could have spotted and helped the City avoid the present debacle *prior* to the administration of these promotional tests are asleep at the switch. If the Department of Justice or another former plaintiff had raised with this Court the appropriate concerns at the appropriate time in the development process for the new tests, as planned in the Consent Decree, then the JAFF would also have become a reviewing party prior to the administration of any new tests and with access to the documents that the City now refuses to provide. (App. A., Consent Decree ¶¶ 11, 77).

The JAFF has made every effort to work with the City to address this problem but has been met with a stone wall. The Consent Decree requires that "[t]he Parties shall endeavor in good faith to resolve informally any differences concerning compliance with this Consent Decree, test development, review, and/or monitoring, prior to bringing such matters to the Court for resolution." (App. A., Consent Decree, ¶ 139).

At present, the City has shut down every avenue of access for the JAFF's experts to further access evidence of the new promotional tests' compliance with the Consent Decree. And the other parties to this case have forsaken their responsibilities to review the City's process. Hence, the JAFF has no other option but to seek enforcement of the Consent Decree by motion to this Court.

*(Remainder of page intentionally left blank)*

## Request for Relief

The U.S. Supreme Court construes Consent Decrees "basically as contracts" in which the parties have the right of specific performance. <u>U. S. v. ITT Cont'l Baking Co.</u>, 420 U.S. 223, 236 (1975); <u>Turner v. Orr</u>, 785 F.2d 1498, 1502 (11th Cir. 1986). The "proper procedure for seeking the enforcement of a consent decree" is a motion alleging noncompliance with its provisions. <u>Florida Ass'n for Retarded Citizens, Inc. v. Bush</u>, 246 F.3d 1296, 1298 (11th Cir. 2001)(quoting <u>Reynolds v. Roberts</u>, 207 F.3d 1288, 1298 (11th Cir.2000)). "If satisfied that the plaintiff's motion states a case of non-compliance, the court orders the defendant to show cause why he should not be held in contempt and schedules a hearing for that purpose." <u>Id.</u> at 1298 (citations omitted). See also <u>Thomason v. Russell Corp</u>., 132 F.3d 632, 634 n. 4 (11th Cir.1998) (same).

The City's situational judgment tests suffer from glaring, identifiable markers of unreliability uniformly recognized by experts in the field. If firefighters and the public are to have confidence in the JFRD promotional process, reliable and valid promotional examinations are essential. The shielding of these testing documents – despite the Consent Decree's robust confidentiality safeguards – has become the City's sword against all attempts to enforce compliance. The City must not be permitted to withhold the very evidence that further demonstrates how the City's examinations are arbitrary, not reliable, not valid, and not job related.

Thus, this Court should enter its order finding that the City has breached the Consent Decree as outlined in this motion and requiring the City to show cause, to produce the test development materials and the documentation of the protest processes for expert review under confidentiality agreements specifying attorney and expert eyes only, to cooperate in good faith in fashioning remedies for the fire fighters already adversely affected by the City's breach of the Consent Decree, and to provide just and proper relief consistent with the Consent Decree and Title VII.

Respectfully submitted,

DONNELLY + GROSS

s/ Paul A. Donnelly
PAUL A. DONNELLY, Trial Counsel
Florida Bar No. 813613
paul@donnellygross.com
Conor P. Flynn
conor@donnellygross.com
Florida Bar No. 1010091
2421 NW 41st Street, Suite A-1
Gainesville, FL 32606
(352) 374-4001
(352) 374-4046 (facsimile)

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on this 7th day of July 2023, I filed the foregoing with the Clerk of Court using the CM/ECF system, which will automatically send a notice to all counsel of record.

## CERTIFICATE OF COMPLIANCE AS TO WORD LIMIT

I HEREBY CERTIFY that the foregoing response and memorandum contains 3,384 words.

/s/ Paul A. Donnelly